KAWA LEASING, LTD. and The
PRESIDENTIAL YACHT TRUST

v.

YACHT SEQUOIA, her engine, boilers,
tackle, apparel, etc., and Ocean
Learning Institute, Inc.

Civ. No. K–82–70.

United States District Court,
D. Maryland.

July 9, 1982.

Randall C. Coleman, Donald D. Greenman, Kevin A. Dunne and Ober, Grimes & Shriver, Baltimore, Md., for plaintiffs.

Thomas J. McGovern, Fort Lauderdale, Fla., and Elana R. Byrd, Annapolis, Md., for defendants.

FRANK A. KAUFMAN, Chief Judge.

The object of this suit is the 105 foot Yacht SEQUOIA, built in 1925 by the Mathis Company of Camden, New Jersey. Several years after she was built, the SEQUOIA was acquired by the Federal Government and became the Presidential yacht. She returned to private hands in 1977 when President Carter disposed of her as an economy measure.

In this suit plaintiff Kawa Leasing, Ltd. (Kawa), the present owner of the SEQUOIA, and plaintiff Presidential Yacht Trust (Trust), the present operator of the vessel,[1] seek to remove an alleged cloud on Kawa's title to the SEQUOIA asserted by defendant Ocean Learning Institute (OLI), from which Kawa purchased the vessel. OLI has counterclaimed pursuant to Rule 13(a) of the Federal Rules of Civil Procedure against both Kawa and the Trust, seeking specific performance of an alleged contract with the Trust which obligated the Trust to make the SEQUOIA available for OLI's use during the winter months each year. At trial, OLI amended its counterclaim additionally to seek damages for breach of that alleged contract during the winter of 1981–82. By agreement of the parties, the liability and relief issues herein have been bifurcated.

Trial of this case was held on April 8 and 12, 1982. Many of the facts are undisputed, although certain critical facts are sharply controverted. This opinion constitutes this Court's findings of facts as well as conclusions of law.

## I. FINDINGS OF FACT

The list of participants in the events relevant and material herein is somewhat ex-

---

1. The suit originally was brought by Kawa alone, styled "to . . . [Kawa's] use and to the use of the Presidential Yacht Trust." At trial, by agreement of the parties, the Trust itself was joined as an additional plaintiff herein.

tensive. Kawa is a California partnership with its principal place of business in that state. Richard W. Arendsee, the executive of a nationally-known business enterprise, is the general partner of Kawa, which was formed for the purpose of (1) purchasing the SEQUOIA from OLI and (2) leasing her to the Trust.

The Trust is a nonprofit District of Columbia corporation with its principal place of business in the District. The moving force behind its creation was Edgar M. Skinner, III. Skinner's idea was to set up a nonprofit corporation financed by tax deductible contributions, in order to make the SEQUOIA available to the President of the United States, other high ranking government officials, and to private individuals, corporations, and the like who, by virtue of their donations to the SEQUOIA's endowment fund, would become members of the SEQUOIA's "Admiralty." Skinner became Chairman of the Board of Trustees and President of the Trust upon its formation in June 1981. He held the former office until July 1981, and the latter office until November 1981 when he resigned for health reasons.

Skinner received help in the formation of the Trust from his friend, Michael Doud Gill, a Washington, D. C. consultant. Gill subsequently became Chairman of the Admiralty Review Board of the Trust. That Board was largely a ceremonial entity, as opposed to the Board of Trustees which was charged with the actual management of the Trust. The Admiralty Review Board was established to review and approve donations from persons or corporations who wished to become members of the SEQUOIA's Admi-

ralty. Gill introduced Skinner to James K. Alford, a Washington, D. C. lawyer and retained Alford to help Skinner form the Trust. Alford handled for Skinner documentation relating to the Trust's incorporation as well as the drafting of the contracts pursuant to which Skinner first purchased the SEQUOIA from OLI and then assigned his contractual purchase rights to Kawa. Alford also drafted a charter for the lease of the SEQUOIA by Kawa to the Trust.

Ocean Learning Institute is a nonprofit Florida corporation with its principal place of business in West Palm Beach, Florida. OLI's primary purpose is to produce educational materials, particularly audio-visual materials, about the seas. It also operates educational programs in conjunction with several southeastern colleges and universities through which students take two week courses in marine geology, coastal zone management and the like. OLI's primary source of funding is through donations. A large percentage of such donations are of vessels, which OLI sells in order to raise funds. John C. Grant is the President and Chairman of the Board of Trustees of OLI.[2]

The SEQUOIA was maintained by the Federal Government as the Presidential yacht for approximately half a century. In that capacity, she served Presidents Hoover, Franklin D. Roosevelt, Truman, Eisenhower, Kennedy, Lyndon Johnson, Nixon and Ford, until she was sold at auction in 1977, during President Carter's term of office. After changing hands several times,[3] she was acquired by OLI in the Spring of 1980 for several purposes. First, OLI wanted to draw attention to itself. Second, OLI de-

---

**2.** All of the principal participants in the events relevant and material herein testified at trial except Gill and Skinner. Skinner underwent open heart surgery on April 7, 1982, the day before trial began. Gill was unavailable because of a death in his family. The parties, in lieu of the live testimony of Gill and Skinner, agreed to admit into evidence their pretrial depositions. The parties also introduced into evidence the depositions of Arendsee, Alford and Grant, each of whom testified at trial.

**3.** OLI bought the SEQUOIA at auction from a group of South Carolina businessmen who had

docked her in Myrtle Beach, South Carolina. There the vessel had been open to the public as a museum. The owners had charged an admission fee to those who wished to tour the ship and view a film which they produced about her. The South Carolina businessmen had bought the SEQUOIA from one Malloy, who had acquired her from the Federal Government when President Carter ordered her sold. Malloy took the SEQUOIA to Newport, Rhode Island, where she was put on public display with an admission charge, before selling her to the South Carolinians.

sired to participate in the preservation of the vessel, because of her historical value both in terms of her association with the Presidency as well as the fact that she is an example of marine architecture and construction which is uniquely American and now extinct. OLI, in a brochure about the SEQUOIA designed to attract potential buyers of the vessel, put it as follows:

> Ocean Learning Institute acquired the USS SEQUOIA in order to bring national attention to its educational program and because it was important that somebody who understood the marine artistry and ship-wright craftsmanship that built these American, now extinct, coastal yachts be involved with her restoration and preservation. Also we must recognize that since the royal ship of Cheops in the 12th century B.C., the yachts and barges of rulers have been the setting for major historical decisions, and such is the case with SEQUOIA and eight of our presidents. The USS SEQUOIA stood on the roles of the U.S. Navy serving eight of our presidents for 47 years and, thereby, made an indelible mark on maritime history of the world.

Also, Grant believed that the SEQUOIA would aid OLI to raise funds and planned to open the SEQUOIA to the public, charging admission for tours and the like, and to make her available to groups who would make donations to OLI in return for such use.

After OLI purchased the SEQUOIA, she was surveyed. The surveyor recommended a long list of repairs to be made to the vessel, and she was taken to the Lantana Boatyard in Lantana, Florida, for that purpose. She remained in the boatyard undergoing refurbishing from the Spring to the Fall of 1980.[4]

After those repairs were completed, the SEQUOIA was docked in West Palm Beach, Florida, while Grant searched for a potential site for a permanent home port for the vessel. The vessel was not put on public display while docked in West Palm Beach, although OLI did allow various civic groups, such as the local YMCA, to hold meetings aboard.

Grant found what he thought would be an appropriate permanent site in Stuart, Florida, at a dock owned by one Peter Makris, who was also the owner of two nearby restaurants, Lord Chumley's Pub and Peter's Pier 4. Makris agreed to allow the SEQUOIA to be docked at his facility, and spent approximately $30,000—$40,000 in fixing up the dock so that it would be able to accommodate the SEQUOIA. OLI moved the SEQUOIA to Stuart in March 1981, but then took her back to the Lantana Boatyard for additional repair work on her bottom in April. Late in that month, with all the repairs to both ship and dock completed, the SEQUOIA was opened at Stuart to the public and remained there until June 12, 1981, the date of the closing of her sale to Kawa. Admission of $3.00 per head was charged. OLI took in approximately $2,500 during the period the SEQUOIA was open to the public at Stuart.

When OLI purchased the SEQUOIA in the Spring of 1980, the purchase price was $750,000. At that time OLI obtained an $800,000 mortgage from the First National Bank of Palm Beach in order to finance the purchase. The mortgage was payable in full in the Spring of 1982. Under the terms of that mortgage, only quarterly interest and no principal payments were required until the Spring of 1982. Grant testified during trial that OLI's net worth in 1982 was close to the $800,000 principal amount of the mortgage, and that he (Grant) needed to come up with a plan which would allow OLI both to retire the debt and to continue to use the SEQUOIA. The solution which Grant hit upon was to sell the SEQUOIA to a third party, who would lease her back to OLI for a number of years. Eventually, the third party would donate the vessel to OLI, taking a charita-

---

**4.** OLI spent about $100,000 on the actual repair work performed on the SEQUOIA and approximately an additional $80,000 in interest payments on its mortgage on the vessel during the period she was in the boatyard. A breakdown of the amounts spent on repair and on interest was made available with the sales brochure mentioned *supra*.

ble deduction at the time. The proposal was outlined as follows in OLI's brochure:

> ... OLI proposes that the donor purchase the SEQUOIA for $1,300,000 and then: (1) lease the SEQUOIA back to OLI for an unspecified period of time in order that Ocean Learning Institute can put the SEQUOIA on display and utilize her for fund raising purposes, (2) a percentage (to be negotiated) of the earnings for the public exhibition and other uses for SEQUOIA will be paid to donor as the consideration for the lease, and (3) after a reasonable period of time (one year) re-evaluate the Fair Market Value of SEQUOIA, having been used as described, and then, presuming that the Fair Market Value is considerably higher than the purchase price, donate SEQUOIA back to OLI.

The OLI proposal was sent to a number of corporations, government agencies and museums. Prior to the time it came to Skinner's attention, it had generated three *bona fide* explorations, none of which came to fruition. OLI also received a few more inquiries from persons who wished to buy the SEQUOIA outright. These it rejected, however, as it was interested in continued use of the vessel.

In the early Spring of 1981, Skinner telephoned Grant and inquired about the SEQUOIA's availability. Skinner had earlier conceived of the idea of putting together a fund to support a presidential yacht, but when he learned that the SEQUOIA herself was on the market, he turned his energies to acquiring her, rather than just any yacht. Grant responded to Skinner's inquiries in a letter dated March 19, 1981, in which Grant enclosed a copy of OLI's brochure setting forth the purchase/lease proposal. Grant indicated in that letter that "the program that ... [OLI] proposed for ... [the SEQUOIA's] use will certainly be conditioned on the desires of whomever backs the yacht financially."

Grant and Skinner agreed to meet at the latter's offices in Washington, D. C. on April 8, 1981. During that meeting, they had a lengthy conversation during which Grant described in detail OLI and its programs and his purchase-lease proposal for the vessel. Skinner intimated to Grant that he thought that such an arrangement would be workable, and described his (Skinner's) plans for restoring the SEQUOIA for use by the President. The two also discussed the purchase price of the vessel. Grant stated that OLI had invested about $1 million in the SEQUOIA[5] and that the asking price was $1.3 million. On April 11, 1981, in response to a request by Grant made during the April 8 meeting, Skinner sent to Grant the following letter of intent:

> Dear John:
>
> Please consider this a letter of intent by me on behalf of private individuals who propose to purchase the USS Sequoia for the sum of $1,000,000 plus interest due which is estimated to be in the amount of $56,794.16.
>
> It is our intent to establish a non-profit entity for the purpose of owning and maintaining the vessel. We plan to fund this non-profit entity through private contributions and to build a multi-million dollar endowment which will provide for the future maintenance of the USS Sequoia and her presentation to the public. We also agree to lease the USS Sequoia to Ocean Learning Institute, Inc. for three months a year for the sum of $1.00 per year plus the prorated share of the annual maintenance costs so long as said institute remains classified as a 501(c)(3) institute under the Internal Revenue Code.
>
> We hope to be able to provide a good faith deposit in escrow by May 9, 1981 and to execute the purchase by June 1, 1981. A designee from Ocean Learning Institute, Inc. shall sit on a scheduling committee which shall determine the exact schedule of the use of the USS Sequoia by Ocean Learning Institute, Inc.

---

**5.** Skinner testified that he understood the term "invested," when used in that context, to mean the amount of money OLI had expended in

acquiring the SEQUOIA, plus repairs, maintenance, and expenses, including interest on OLI's mortgage.

each year, shall determine the necessary maintenance that would be shared and shall make any other recommendations in the best interests of the USS Sequoia. We will provide a member of said committee. The captain of the USS Sequoia will be the third member of the committee.

You might be interested to know that we are planning to establish a prestigious "Admiralty Review Board" for the USS Sequoia. Already agreeing to serve on this board are member of the First Family of President Eisenhower—Michael Doud Gill, former Secretary of the Navy —J. William Middendorf, II and Co-Chairman of the 1981 Presidential Inaugural Committee—Robert K. Gray. We will invite you to serve on this board as well.

*　　*　　*　　*　　*　　*

I consider it an honor to be a small part of an effort that can do so much to help preserve such a national treasure as the USS Sequoia.

Sincerely,<br>/s/<br>Edgar M. Skinner, III

In response, Grant addressed to Skinner a letter dated April 14, 1981, enclosing a draft contract providing for the sale by OLI of the SEQUOIA for $1 million plus any interest on OLI's indebtedness with respect to the vessel due at closing, and also providing for the lease of the SEQUOIA to OLI for $1.00 per year during the period December 1 to the day after Easter. Grant stated in that April 14 letter that the draft contract sent with that letter was not a final document.

It is not intended that the enclosed agreement encompass all details between Ocean Learning Institute and the TRUST that you are setting up, but rather merely to establish an overall understanding about the purchase of the SEQUOIA by your newly formed TRUST for that purpose. It would seem the way to cement the details of the relationship between Ocean Learning Institute and the new TRUST would take the form of a lease.

Grant also invited Skinner to come to Stuart and look at the SEQUOIA after she returned from the Latana boatyard upon completion of bottom work.

Skinner and Gill [6] went to Stuart on April 23, 1981, taking with them a draft contract for the sale of the SEQUOIA and her annual lease-back to OLI during the December 1 to Easter period. After reviewing the document, Grant expressed dissatisfaction with its warranties and lease provisions. As to the former, Grant testified at trial that he thought that Skinner and Gill were trying to make him "warrant the condition of the vessel," something he was unwilling to do because of her age and the fact that in his experience vessels of that age were sold "as is." [7] As to the lease-back provisions, Grant testified that while he saw nothing wrong with them *per se*, they were very general and that he had expected, after receipt of Skinner's April 11 letter, that the lease-back arrangements would subsequently be embodied in a separate formal agreement.

As a result of the Grant-Skinner-Gill discussion in Stuart on April 23, 1981, Skinner agreed to return to Washington and to draft a different contract for Grant's re-

---

**6.** Skinner had by this time enlisted Gill's aid, on an informal basis, in creating the Trust.

**7.** OLI's promotional brochure stated that the SEQUOIA had been restored to her original state and that she was in "Bristol condition." Grant testified that that term relates to the appearance of a boat. He maintained that the SEQUOIA was, in fact, in such condition at the time the brochure was formulated and circulated, at the time of the closing, and at all times in between. He also testified that after the repair process was completed, the SEQUOIA was in excellent mechanical condition. Plaintiffs of-

fered no evidence contrary to Grant's testimony with regard to the mechanical condition, but disputed his characterization of the physical appearance of the vessel as being in Bristol condition. They offered, however, no expert testimony concerning the same. In any event, because of the view which this Court takes with regard to the alleged "misrepresentations" made by Grant, *see* note 28, *infra*, it is unnecessary for this Court to decide whether or not the SEQUOIA was in Bristol condition when she was sold.

view, taking into consideration the views which Grant had expressed during the April 23 meeting. Before Skinner and Gill departed from Stuart, Grant gave to Skinner a letter dated April 23, 1981, in which OLI agreed not to sell the SEQUOIA before the receipt from Skinner of a good faith deposit of $100,000 to be credited toward the purchase price, provided such deposit was made by May 9, 1981.

In due course, a contract signed by Skinner as trustee for a corporation in formation and bearing the date April 25, 1981 was received by Grant. Grant made a few changes in it which are unimportant for purposes of this case, initialled those changes and sent the contract back to Skinner. Skinner returned the contract to Grant on April 30, 1981, after initialling the changes made by Grant. Grant then signed the contract on behalf of OLI.

The April 25 contract provided that the purchase price was to be $1,065,000, payment of which was to be made in two stages. An initial earnest money deposit of $100,000 was to be paid by May 9, 1981. The balance of $965,000 was due on the date of settlement, then targeted for June 1, 1981. Alternatively, the buyer was given the option of assuming OLI's mortgage indebtedness in the amount outstanding at the time of settlement and paying OLI the difference between that amount and $965,-000.[8]

After returning from the April 23 trip to Florida, Skinner attempted to arrange for the payment of the $100,000 deposit by the May 9 deadline. His efforts in that regard were unsuccessful until Gill mentioned to him the possibility that Arendsee, who at that time was a client of Gill's consulting firm, might be interested in participating in the project. Arendsee agreed to put up the $100,000 deposit, but insisted that he have, for his own protection, some control over the SEQUOIA in exchange. Accordingly, Skinner agreed to assign his rights under the April 25 contract to Arendsee as trustee for Kawa, which Arendsee was in the process of forming. The assignment was completed by a document dated May 8, 1981. Skinner and Arendsee, as trustees for their respective organizations in formation, *i.e.*, the Trust and Kawa, also entered that day into an interim lease-charter agreement whereby Arendsee contracted to lease the SEQUOIA to Skinner for a three-year period beginning June 15, 1981, with provision for extensions.

Also on May 8, Skinner went to Florida to make certain that the $100,000 deposit had been received by Grant and to obtain Grant's agreement to a modification of the April 25 contract so that Skinner could assign his rights under the contract to Arendsee.[9] Skinner took with him a letter addressed by Skinner to Grant dated May 7, 1981, which detailed the future relationship between the Trust and OLI.[10] Grant ac-

---

**8.** The mortgage assumption clause was inserted in the April 25 contract on the strength of Grant's representation that the mortgage could be assumed by a qualified buyer. He made that representation based on a conversation, with Skinner on the telephone and listening in, with the officer of the bank in Palm Beach which had made the SEQUOIA loan to OLI in the Spring of 1980.

**9.** Paragraph 9 of the April 25 contract, as originally drafted, provided:

BUYER [*i.e.*, Skinner] agrees to assign this contract and the SEQUOIA to a corporation in formation by BUYER. Following said assignment the term "BUYER" as used in this Agreement and/or all documents executed in furtherance of this Agreement shall include such corporation and such corporation shall be bound by all terms and conditions thereof.

As modified by Skinner and assented to by Grant, ¶ 9 reads as follows:

BUYER and SELLER [*i.e.*, OLI] agree that BUYER may, at his option, assign this Agreement and the SEQUOIA to a third party individual or corporation or other entity. Following said assignment the term "BUYER" as used in this Agreement and/or all documents executed in furtherance of this Agreement shall include such third party individual or corporation or entity, and such third party individual, corporation or entity shall be bound by the terms and conditions thereof.

**10.** The May 7 letter, although originally drafted by Skinner, was polished by Alford. Alford testified at trial that he viewed the letter as a "lawyer's nightmare." He testified in deposition that he had asked Skinner if it was really necessary to send that letter to Grant, and that

cepted those terms in Florida during Skinner's May 8 visit. The letter provided:

Dear John:

Confirming our discussions regarding the U. S. S. SEQUOIA I am pleased to recap my *recommendations*[10A] as follows, which I understand to be compatible with your desires:

1. The Presidential Yacht Trust, or any other entity which I form or designate (hereinafter referred to as the TRUST), will provide a full-time crew, consisting of at least a licensed captain and engineer, who shall man the SEQUOIA at all times and be in the employ, and exclusively under the control of, the TRUST.

2. The TRUST will provide for all maintenance and insurance for the SEQUOIA.

3. If the SEQUOIA is in seaworthy condition, I or the TRUST will made every effort to see that she is moved to your dock in Stuart, Florida from approximately December 1 of each year through Easter of the following year.

4. For any time that the SEQUOIA is in Florida, the TRUST will remain in full control of the SEQUOIA and will have sole discretion as to the manner and time of its use, but will make it accessible to Ocean Learning Institute for five (5) days a week, so long as the Institute is recognized as a non-profit public charity under Section 501(C)(3) of the Internal Revenue Code and so long as the Institute's use of the SEQUOIA is consistent with its charter and the articles of incorporation and by-laws of the TRUST.

5. Ocean Learning Institute shall bear all costs directly relating to its use of the SEQUOIA, including but not limited to extra insurance coverage, third party liability, licensee, permits, fees, fuel, repairs of any kind, food, beverage, promotional expense and fines or penalties attributable to such use.

6. Ocean Learning Institute shall have access to the SEQUOIA subject to the specific approval of the TRUST in each instance in order to insure that the Institute's use or access to the SEQUOIA does not conflict with the programs or purposes of the TRUST, or violate any federal or state laws, regulations or statutes.

7. The TRUST shall have the right, at its discretion, to approve or reject any and all promotion of or reference to the SEQUOIA by Ocean Learning Institute.

8. Ocean Learning Institute and its related foundation and principals shall pay the TRUST fifteen percent (15%) of all gross proceeds, fees, donations and/or other funds received that result from any access, use or reference to the SEQUOIA.

I suggest that we incorporate the above into a comprehensive agreement to be executed between us at the time of settlement of the existing contract for the purchase of the SEQUOIA. The third party assignee of the April 25, 1981 Agreement of Purchase and Sale for the SEQUOIA will grant the TRUST control and discretion over the use and operation of the SEQUOIA.

Sincerely,

/s/

Edgar M. Skinner, III

According to the testimony of both Grant and Skinner, the May 7 letter represented a summary of a number of telephone and face-to-face conversations which they had had with regard to the return of the SEQUOIA to Florida during the winter months since their April 23 meeting. Both of them conceived the May 7 letter as a written memorialization of oral understandings which they had previously reached. Indeed, Skinner explicitly testified during the taking of his deposition that when he wrote the May 7 letter, he intended it to impose a binding obligation on the Trust.[11] In addi-

---

Skinner had responded that he had an obligation to do so.

**10A.** Emphasis added; *see* discussion *infra* at p. 1068.

**11.** There is other evidence in the record of an intent to preserve a Trust—OLI relationship after the sale of the SEQUOIA. In a brochure written by Skinner describing the Trust and

tion, it is clear that Skinner appreciated the interdependence, from OLI's point of view, of the sale of the SEQUOIA and her lease-back. As he testified,

Q [By counsel for OLI] Would you please explain in your own words the purpose of . . . [the May 7] letter?

A Well, when I was discussing with John Grant his sale and our purchase of the Sequoia, John informed me by prior letter and proposed prior agreement that as a condition of the transaction, he would like to see . . . an agreement of The Presidential Yacht Trust to bring the vessel to Florida in the winter from roughly December 1 through Easter and to allow him to have reasonable access to the vessel for the purposes of promoting his . . . non-profit institute.

Q So in sending this letter back, it was a dialogue between the two of you.

A It was a confirmation of my understanding of what John and I had agreed to, which was to be part of the condition of the sale and purchase.

Grant's discussions with Skinner throughout this period also encompassed OLI's proposed uses of the SEQUOIA when she was in Florida, including her public display as a museum, the sale of SEQUOIA memorabilia, such as T-shirts, plates, Waterford crystal and the like, the hosting of fund raising dinner parties on board the vessel and other fund raising activities. According to Grant, those discussions included not only Skinner, but also Gill and, prior to the closing in June 1981, Arendsee. Grant also testified

that of the three, only Gill appeared to have some reservations about OLI's proposed use of the SEQUOIA for promotional purposes and about her being docked at Stuart. Gill indicated that he preferred that the SEQUOIA dock in Palm Beach or Miami. However, Grant testified that he stressed to Gill and the others that OLI would conduct itself in a dignified manner, and that part of OLI's purpose in acquiring the vessel and attempting to attract individual or corporate donors to endow her was to prevent her from becoming a "sideshow." Grant's testimony indicates that Gill never pressed any objections he may have had with regard to the lease back of the SEQUOIA to OLI or to OLI's proposed use of the vessel for promotional purposes. In any event, prior to the closing, Gill never stated to Grant, either explicitly or implicitly, that the SEQUOIA would not return to Florida to be available for OLI's proposed use.

On May 13, 1981, Skinner, Gill and Arendsee went to Florida. They first went to Palm Beach to talk to the loan officer at OLI's bank with regard to the assumption of OLI's mortgage on the vessel. They were told by the loan officer then present [12] that the loan was not assumable. They then went on to Stuart so that Arendsee could view the SEQUOIA. After visiting the vessel, they met Grant and Makris in one of Makris' restaurants at Stuart for a meal and some drinks. Although both Arendsee and Gill testified later that they had found the SEQUOIA to be in very poor condition,[13] neither told Grant of their concerns about the same at this or any other

---

apparently circulated among potential donors Skinner wrote,

It is anticipated that the USS Sequoia will make a 14-day cruise to Florida in the fall of each year—where arrangements have been made to berth her at the facilities of a non-profit institution in Stuart during the winter months—and would then make a 14-day cruise to the nation's capital in the spring.

While it is unclear as to exactly when that brochure was written and/or first used, Gill testified that it was first circulated to persons who might be interested in the project, in the latter part of April and into May.

Former Senator George Murphy and General Bernard Schreiber, who were both members of

OLI's Board of Advisors, were at some time after April 1981, appointed members of the National Events Committee of the Trust. Grant testified that this Committee was established (at his suggestion) to map out the SEQUOIA's annual schedule.

**12.** Gill, Arendsee and Skinner did not talk to the loan officer who originally had approved OLI's loan, as he was in the hospital recovering from a coronary by-pass operation.

**13.** Arendsee testified that "the wood was rotted, the paint peeling, the carpets were soiled, the varnish was gone."

time prior to the closing. Although the Palm Beach bank had stated that it would not allow Arendsee to assume OLI's mortgage, no one suggested to Grant that that would affect the deal. Grant, when informed in Stuart on May 13, 1981, of the position taken earlier that day by the Palm Beach bank, expressed surprise that the bank had so acted, and asked Skinner, Gill and Arendsee why they had gone directly to the bank without letting him (Grant) know, as he had dealt with the bank extensively and believed that he could perhaps have smoothed their path. On May 13, during the Stuart meeting, Grant also again talked with Skinner, Gill and Arendsee about the return of the SEQUOIA to Florida. Grant's testimony in that regard is corroborated by that of Makris and Gill, although Gill also testified that he understood on May 13th that no binding commitment for the return of the vessel had been made. Arendsee testified that he did not recall any specific conversation at that Stuart meeting about the lease-back to OLI. However, he did testify that during their return trip to Washington he had asked Skinner and Gill what all the talk concerning the return of the vessel was about and that Skinner had then told him about the May 7 letter. Arendsee testified that Skinner also assured him that no binding commitment had been made, and that he (Arendsee) had told Skinner during that return trip that if the SEQUOIA was required to return to Florida for OLI's use, the deal was off.

Skinner, on the other hand, testified that after the May 13 meeting in Stuart, he discussed the lease-back to OLI at length with Arendsee, and that Arendsee agreed to that arrangement. Arendsee testified in open Court; Skinner did not (see note 2 supra). However, it is not necessary to resolve any factual differences between Skinner and Arendsee, because, as discussed infra in the body of this opinion, Arendsee, Gill and others, purporting to speak for

Kawa and the Trust, in any event permitted Grant to believe that Skinner had authority to act for and bind Kawa and the Trust to the lease back of the vessel and Skinner in fact did so act and did so purport to bind Kawa and the Trust.

Following the May 13 meeting, the SEQUOIA was examined by a surveyor, and also by a person who was to be appointed by her would-be purchasers to become her captain after settlement. The SEQUOIA underwent sea trials in early June, in which one or more representatives of Kawa and/or the Trust participated, and was made ready for the closing on June 12.[14] During this period the Trust took form. On June 2, 1981, its Articles of Incorporation were filed and a certificate of incorporation was issued. On June 11, 1981, the organizational meeting of the interim trustees and incorporators was held and the Articles of Incorporation and the by-laws accepted. At the meeting trustees, including Gill and Skinner, were elected, as were officers of the corporation. Skinner was elected President. Also during early June, the details of the relationship between the Trust and Kawa were negotiated, culminating in a final charter agreement dated June 11, 1981. During this same time frame, Kawa itself was formed as a partnership.

The negotiation of the Charter agreement was handled by Alford (for the Trust) and Arendsee's representatives (for Kawa). Skinner and Arendsee went over the final draft of the agreement on June 11, the day before the closing, and agreed upon it. Throughout this period Alford was very busy drafting documents and keeping in touch with Arendsee's representatives, and was in close contact with Skinner and Gill. He testified that Skinner and Gill, particularly the latter, appeared to have negative feelings toward Grant and OLI, especially with regard to the alleged misrepresentations about the assumability of OLI's Palm Beach bank loan and the physical condition

14. The original closing date of June 1, 1981 was put off so as to allow Arendsee to arrange for the financing of the purchase of the SEQUOIA. Arendsee ultimately was able to arrange financing with the American Security Bank of

Washington, D. C. He and Grant agreed that the purchase price for the SEQUOIA would be modified to reflect the additional interest due on OLI's mortgage for the June 1—June 12 period.

of the SEQUOIA. Alford testified that Gill, in a number of conversations, said that the SEQUOIA should not go back to Florida, was not going back, and that Grant did not expect it to go back. Alford further testified that while Skinner did not make any specific comments, Skinner did not disagree with Gill's statements. However, on June 9 or 10, Skinner asked Alford to draft a lease contract between OLI and the Trust along the lines set out in the May 7 letter. Alford testified that that request caught him by surprise, because of all the above-referenced negative comments about Grant and OLI which he (Alford) had heard over the previous few weeks. Nevertheless, Alford did draft a lease contract. Although he told Skinner that he had done so, Skinner never asked to see that draft, nor did Alford show it to him.

The closing took place on June 12, 1981, at the First National Bank of Palm Beach. Present were (1) Skinner, (2) his wife, (3) Arendsee, (4) Alford, (5) a bank representative, Michael Peak, (6) a Coast Guard documentation agent, Genie Lance, and (7) Grant. Because OLI was responsible for all repairs to the vessel until closing, the price was adjusted for various items which did not work, such as the dishwasher, a radar tube, etc. No mention was made in any settlement document or orally or otherwise at the time of closing of the allegedly deplorable condition of the SEQUOIA, nor of any alleged misrepresentation by Grant with regard to the assumability of OLI's mortgage. The final price after all the adjustments was $1,066,165.21. Since the price essentially was negotiated down to the wire, Arendsee had with him a stack of cashier's checks of various denominations, some combination of which he signed in order to reach the final purchase price figure. At some point during the closing, Grant asked Arendsee what precisely Arendsee's role was with the project. Arend-

see, in response, assured Grant that he and Kawa were merely the financial backers and that Skinner and the Trust would have total control of the operation of the SEQUOIA.

Grant testified at trial that before handing over the bill of sale he (Grant) asked Skinner whether the agreement with regard to the lease between OLI and the Trust had been prepared, that Skinner replied that he (Skinner) had not had a chance to prepare the documents pertaining to the lease back, that thereupon he (Grant) took the May 7 letter out of a folder and asked Skinner if he (Grant) could rely upon that letter, that Skinner stated specifically that Grant could so do, and that Arendsee made no comment at all in that regard. Grant's said testimony is supported by the testimony of Skinner, Peak and Lance.[14A] On the other hand, Alford and Arendsee both testified at trial that, during the closing, neither heard Grant ask about the lease agreement or make any reference to the May 7 letter or saw Grant physically produce that document. Alford and Arendsee also testified that the settlement room and the table around which they were sitting was small, that they were both present and paying close attention to what was going on at all times during the settlement and that it would have been very unlikely for either of them to have missed such statements or action on the part of Grant.[15]

Of all the participants at the closing, only Lance has absolutely no discernable connection to any of the parties herein or the within litigation.[16] While plaintiffs have argued that her testimony was confused, and while it does appear to this Court that some of Lance's testimony was indeed not very clear, her testimony with regard to the events in question is quite pointed:

> Q [By counsel for OLI] ... [Y]ou will have to be a little more specific as to what ... [Skinner] did.

---

**14A.** Peak and Lance testified on deposition, not live at trial.

**15.** *But see* note 18 *infra.*

**16.** Peak, although essentially a neutral party, may be said to have some interest inasmuch as he claims to be owed money by the Trust as reimbursement for expenses allegedly incurred by him during the SEQUOIA's trip to Washington after the closing.

A Well, they talked about the money, the money part I don't understand. But anyway, they did money business. Mr. Grant and he had a conversation. Mr. Grant had a big portfolio with all the papers, and there was a conversation about the boat coming back to Florida. And he asked, was something ready, and somebody said, "No, we're not ready."

\* \* \* \* \* \*

Q The "somebody" that you are speaking about—

A Mr. Skinner and this . . . [Alford], I think, two people said "We're not ready." And I thought that was funny because I was ready but anyway, that's beside the point.

Mr. Grant had a letter or something, and he got up with his letter and he went over to Mr. Skinner and he said, "Well,—

\* \* \* \* \* \*

Q Let's get back to the actual role Mr. Skinner was playing here. Would you say specifically only what Mr. Skinner said that you know, that you heard Mr. Skinner say to Mr. Grant?

\* \* \* \* \* \*

A Well, I can't answer it that way because that is not the way it came out. Mr. Grant asked the question.

[Counsel for OLI]: Fine. You can always explain it.

A All right. Mr. Grant, after a lot of money talk, okay, Mr. Grant said to Mr. Skinner, said to whoever, about the boat returning to Florida, and there was suppose [sic] to be some kind of agreement or some paper to be signed about that. And Mr. Skinner said it wasn't ready. Then Mr. Grant went in his folder and he got his letter out that he evidently—I didn't see the letter, but anyway, and he went to Mr. Skinner with the letter and he said, "Do you agree with this letter?"

Q What was Mr. Skinner's response?

A "Yes."

Q Can you remember anything else he said?

A No. I don't remember anything about that. I was kind of floored about it coming back to Florida in the first place.

On cross examination by counsel for plaintiffs, Lance testified:

Q [By counsel for plaintiffs] You stated that after you heard this conversation with Mr. Grant and Mr. Skinner, that Mr. Grant went through a briefcase and searched out a letter?

A Well, no, he had the letter in his hands when he was asking the question of Mr. Skinner.

Q You stated previously that you didn't know what it was, it could have been a letter, it could have been something; are you deciding in your testimony now?

A It's a letter; it's a letter.

Q How do you know it was a letter?

A Well, I saw the letter.

Q Did you read the letter?

A Well, I didn't read it, no, but it was a letter, had writing on the top. I was close enough that I could see that it was a letter.

In the light of all of the evidence, this Court finds as a fact that Grant, at the time of the closing on June 12, 1981, asked Skinner about the final documentation relating to the lease-back of the SEQUOIA to OLI, that Skinner told Grant that the documentation was not prepared, that Grant asked Skinner whether Grant could continue to rely on the terms of the May 7 letter, that Skinner replied that Grant could do so, and that all of this occurred with Arendsee and Alford present at the settlement and without any indication of disagreement by Arendsee or Alford.

After the closing, the SEQUOIA sailed from Stuart to Washington. On board were, among others, the Skinners, Arendsee, Gill, who had joined the party on June 12, 1981, and Peak.[17] Peak came along at

17. Peak testified that a day or so out of Stuart, a conversation arose about the boat returning

Skinner's invitation to take photographs of the excursion, which he (Peak) hoped subsequently to sell to *National Geographic*, or to some similar magazine. The SEQUOIA arrived in Washington on June 29, 1981, well in time for a planned July 4 party aboard.

Grant and his wife were invited to that party and travelled to Washington on July 1 or 2 for the purpose of attending it. When they arrived, Grant was informed by Skinner that the invitation to the Grants had been revoked. Grant demanded and got a meeting with Arendsee on July 3, at which Skinner and Gill were also in attendance. Grant testified that he asked for that meeting solely to ensure that the agreement to return the vessel was going to be upheld, and that Skinner's "uninvitation," while seemingly a social slight, was not too important to him. Grant further testified that also not too important from his point of view was the fact that Gill informed him, at the July 3 meeting, that the invitation to serve on the Admiralty Review Board of the Trust which had been extended to him in Skinner's April 11, 1981 letter of intent was also being rescinded, since that Board was to be composed solely of persons or corporations which had made contributions to the Trust. According to Grant, he was assured by Skinner, Arendsee and Gill, at the July 3 meeting, that the SEQUOIA was indeed going to return to Florida, and that he (Grant) was reinvited to the July 4 party.

Gill and Arendsee, however, testified that Grant asked, during the July 3 meeting, to be invited to the July 4 party, to which he had been "uninvited" because, in Arendsee's words, he was "persona non grata." Arendsee testified that neither he nor the Trust wanted anything to do with Grant because he, Grant, had lied to them about the condition of the vessel and the assumability of the Palm Beach bank loan. Arendsee also testified that while Grant and his wife were reinvited to and in fact attended the party, he (Arendsee) told Grant during the pre-party July 3 meeting, that the SEQUOIA absolutely would not be returning to Florida for OLI's use. Gill testified to the same effect. In addition, Arendsee testified at trial that Grant "understood" during the July 3 meeting the reasons stated by Arendsee and others and agreed that the vessel would not be returning to Florida for OLI's use.

In assessing the conflicting testimony concerning the July 3 meeting, it is important to keep in mind that Grant had conceived of the idea, almost as soon as he had purchased the SEQUOIA, to sell her subject to a lease back to OLI so that OLI could use the SEQUOIA for fund raising purposes, that Grant had consistently held to that idea, that Grant had thought that such an arrangement had been consummated with the Trust and had confirmed his said understanding only a few weeks before during the closing of the sale of the SEQUOIA. In the light of those facts, while Arendsee and Gill may well, on July 3, have indicated their opposition to the SEQUOIA returning to Florida, it is almost inconceivable that Grant would suddenly have agreed on July 3 with no consideration moving to him or to OLI, that the SEQUOIA would not return to Florida for OLI's use. Grant's actions after July 3 are consistent with that view since after that date he began to make arrangements for the SEQUOIA's return to Florida, talking with Florida officials with regard to the erection of road signs on U.S. Route 1 to indicate the SEQUOIA's presence in Stuart, and making plans to sponsor an art auction on board the vessel, with the proceeds to go to OLI.

On or about July 12, 1981, the Board of Trustees of the Trust held a meeting, at which Gill and Skinner stepped down as interim trustees and the permanent trustees of the Trust took office. Skinner testified that the May 7 letter was also dis-

to Florida. During that conversation, Gill stated that "John Grant is crazy if he thinks this boat is coming back to Florida after all the misrepresentations that he made, there is no way this boat is ever coming back under his

control." Gill did not testify as to the particulars of any such conversation, but indicated that one had taken place, and that "none . . . [of the participants] were very happy with Mr. Grant at the moment."

cussed but that no conclusions with regard to the letter were reached, and that the topic merely was tabled for later discussion. Charles Chamberlain, who became Chairman of the Board of Trustees at that meeting, also testified at trial that a discussion of the May 7 letter took place at that time. Chamberlain did not indicate any specific outcome of those discussions.[18]

In September 1981, Grant met with Gill on business unrelated to the SEQUOIA. During the course of a general conversation Gill stated that although he was not "the official voice" of the Trust, the SEQUOIA would not be returning to Florida for OLI's use. Grant stated that this was the first time that he (Grant) had been so informed by anyone connected with plaintiffs. On October 1, 1981, Grant wrote to Skinner, stating that he and Gill had a "lengthy discussion" the previous month, and further stating:

> [T]here appears to be some perceived differences [sic] as to the use and scheduling of the Sequoia. We naturally are expecting the yacht to return, in accordance with your letter, on or around December 1, 1981. Peter Makris has spent a great deal of money in improvement of SEQUOIA's Pier and Peter's Pier 4 since your departure. Also, the City of Stuart is anticipating the yacht's return.
>
> We certainly are open to any constructive suggestions regarding proposed changes to our agreement. We would heartily support any program beneficial to the yacht, its dignified presentation to the public; but at the same time, during the winter months, a program which is a benefit to the necessary fund raising program of Ocean Learning Institute....
> [Our] position is that we have a binding agreement for the Presidential Yacht Trust to return Sequoia to Florida waters, allowing specific use for five days a week by Ocean Learning Institute.

Skinner's health had by that time begun to fail, and Grant received no response to the letter. Grant wrote again to Skinner later in October 1981, detailing some of his plans for the vessel. In response Grant received a letter dated November 16, 1981 from Chamberlain, stating, *inter alia*, that a review of the Trust's files revealed no agreement between OLI and the Trust with regard to the SEQUOIA's return to Florida for OLI's use, and that the Trust had no intention of permitting that to happen. The letter complained about Grant's alleged misrepresentations concerning the assumability of OLI's mortgage and the physical condition of the vessel.

## II. SUBJECT MATTER JURISDICTION AND CHOICE OF LAW

On January 11, 1982, Kawa filed the within suit seeking a Decree that Kawa has exclusive right to determine use of the SEQUOIA and that OLI has no interest in the vessel, and asserting that this Court has admiralty jurisdiction over the claims plaintiffs raise herein. Specifically, plaintiffs bring this suit as a petitory action pursuant to Supplementary Admiralty Rule D of the Federal Rules of Civil Procedure.[19] A petitory suit is to some extent akin to the terrestrial suit to quiet title, although, as opposed to a quiet title suit in which title is perfected against the world, the admiralty procedure to try title afforded by a petitory action can only be utilized with a specific adversary in mind. 7A Moore's *Federal Practice* ¶ D.03, at D–25.

Herein no question is raised with regard to the validity of Kawa's title *per se*. Rather, Kawa and the Trust seek to remove, and OLI resists the removal of, a cloud on Kawa's title, namely, OLI's asserted contractual right to annual use of the SE-

---

**18.** Chamberlain testified that the subject of the May 7 letter was brought up by Alford, who stated at the Board meeting that discussion of OLI's future use of the SEQUOIA had come up not only during negotiation with OLI but also at the closing on June 12.

**19.** That rule provides, in pertinent part:

> In all actions for possession, partition, and to try title maintainable according to the course of the admiralty practice with respect to a vessel ... the process shall be by warrant of arrest of the vessel ... and by notice in the manner provided in Rule B(2) to the adverse party or parties.

QUOIA for five days a week during the December 1 to Easter period. Strictly speaking, a distinction exists between suits to quiet title and those to remove a cloud on title:

A bill to quiet title, strictly considered, is substantially a bill of peace,[20] the purpose of which is to put an end to vexatious litigation in respect of the property involved. A bill quia timet or to remove a cloud is a bill to procure the cancellation, delivery up, or release of an instrument, encumbrance, or claim constituting a claim on plaintiff's title, and which may be used to injure or vex him in the enjoyment of his title.

74 C.J.S. *Quieting Title* § 2, at 12 (footnotes omitted). Nevertheless, the distinction between the two actions is sometimes blurred. *Id.*

■ It is unclear whether a petitory action is analogous to an action to quiet title in the latter's narrower sense, *i.e.*, as a bill of peace, or in the latter's broader sense, *i.e.*, as a suit to remove a cloud on title. However, there would appear to be no reason to limit the scope of a petitory action to the narrower sense of a quiet title action. A petitory suit is designed, in essence, to settle disputes which render it difficult for the owner of a vessel to have complete and unfettered enjoyment of title to that vessel, including control over its use, the ability to convey free of encumbrances, and so forth.[21]

**20.** Under the usages of equity, bills of peace are of two kinds:

First. Those which are brought to establish a right claimed by the plaintiff, but controverted by numerous parties having distinct interests originating in a common source. A right of fishery, asserted by one party and controverted by numerous riparian proprietors on the river, is an instance given by Story where such a bill will lie. In such cases a court of equity will interfere, and bring all the claimants before it in one proceeding, to avoid a multiplicity of suits. A separate action at law, with a single claimant, would determine nothing beyond the respective rights of the parties as against each other, and such a contest with each litigant might lead to interminable litigation. To put at rest the controversy, and determine the extent of the rights of the claimants in a common subject, the bill lies, which is thus essentially one for peace. *Sharon v. Tucker,* 144 U.S. 533, 542, 12 S.Ct. 720, [722] 36 L.Ed. 532.

Second. Bills of peace of the other kind lie where the right of the plaintiff to real property has been unsuccessfully assailed in different actions, and is liable to further actions of the same character, and are brought to put an end to the controversy. The equity in such a case arose from the protracted litigation for the possession of the property which the action of ejectment at common law permitted. That action was founded upon a fictitious demise, between fictitious parties, and a recovery in one action constituted no bar to another similar action or to any number of such actions. A change in the date of the alleged demise was sufficient to support a new action. Thus the party in possession, though successful in every instance, might be embarrassed and vexed, if not ruined, by a litigation constantly renewed. To put an end

to such litigation, and give repose to the successful party, courts of equity interfered and closed the controversy.

To entitle the plaintiff to relief in such cases the concurrence of three particulars was essential: He must have been in the possession of the property; he must have been disturbed in its possession by repeated actions at law; and he must have established his right by successive judgments in his favor. *Chicago Auditorium Ass'n v. Cramer,* 8 F.2d 998, 1004–05 (N.D.Ill.1925), *rev'd on other grounds sub nom. Chicago Auditorium Ass'n v. Willing,* 20 F.2d 837 (7th Cir. 1927), *rev'd* 277 U.S. 274, 48 S.Ct. 507, 72 L.Ed. 880 (1928).

**21.** *Cf.* Moore's *Federal Practice* ¶ D.03, at D–25 —D–26. In his discussion of the distinction between petitory suits and possessory suits, which are also governed by Supplemental Rule D and in which right to possession is determined, Professor Moore states:

In a possessory suit, the plaintiff must be out of possession. And, while possession may not be a bar to a petitory action, the plaintiff in possession would at least, to overcome the "case or controversy" requirement, be required to base his suit upon the allegedly wrongful refusal of the defendant to provide him with the indicia of title or ownership to which he avers he is legally entitled.[2]

[2] It seems reasonably clear that possessory suits can only be brought by those out of possession and who are seeking to have possession restored to them. It is not inconceivable, however, that one in possession of a vessel might still want to litigate the question of title and, so long as the issue is presented in the context of an actual controversy, possession should constitute no barrier to such an action. The paucity of litigation in this

But no matter how the scope of a petitory action is limited, plaintiffs' within prayers for relief would appear petitory in nature, which in turn means that admiralty jurisdiction is present. Diversity of citizenship also exists as to plaintiff's complaint because the parties are citizens of different states and the value of the use of the SEQUOIA exceeds $10,000.[22] Sitting as a Maryland court, this Court has power in equity to remove a cloud on title, *see Homewood Realty Corp. v. Safe Deposit & Trust Co.*, 160 Md. 457, 469–70, 154 A. 58 (1931), since a federal court in a diversity case has that type of power if the state courts in its forum possess the same. *See Reynolds v. First Nat. Bank of Crawfordsville*, 112 U.S. 405, 410–12, 5 S.Ct. 213, 216–17, 28 L.Ed. 733 (1884). Independent diversity jurisdiction also exists over defendant OLI's counterclaim because, again, the parties are diverse and the amount in controversy exceeds $10,000.[23]

The counterclaim is based on the contract allegedly represented by the May 7 letter. That contract was entered into in Florida, and provided for performance in Florida.

Accordingly, Florida law would appear to govern its construction and enforcement. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Chesapeake & Potomac Telephone Co. v. Allegheny Constr. Co.*, 340 F.Supp. 734, 739 (D.Md.1972). However, the April 25 contract for the sale of the SEQUOIA contains a choice of forum clause which provides that the contract is governed by District of Columbia law. While in this case the agreement to sell and the agreement to lease back are related, it is not clear whether Skinner and Grant intended the comprehensive agreement, including the lease-back arrangements, to be entered into at the closing contemplated by the May 7 letter, also to be governed by District of Columbia law. That question need not be answered because Florida law and District of Columbia law concerning any of the legal issues in this case call for the same results.

## III. STATUTE OF FRAUDS

The Florida and District of Columbia Statutes of Frauds [24] are very similar,

---

area makes it impossible to either support or refute this contention. For indications to the contrary in instances where this precise question was not considered, see 1 Benedict on Admiralty (7th ed. 1974) § 202; and *The Bonnie Doon* (D.Del.1888) 36 Fed. 770, 771, where the court said: "Petitory, as well as possessory suits, are also within the admiralty jurisdiction, and may be brought in all cases to reinstate the owners of ships who have been wrongfully deprived of their property." It is submitted that such statements are accurate insofar as they go, but that they fail to consider the ultimate reach of the petitory suit.

22. "If a suit is brought to quiet title to land or to a leasehold interest in land, and the cloud affects the entire title, then the value of the property or the leasehold interest plaintiff seeks to protect is the measure of the amount in controversy." 14 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure: Jurisdiction and Related Matters § 3702, at 386 (1976). Herein the value of the SEQUOIA is approximately $1 million.

23. As far as independent subject matter jurisdiction over OLI's counterclaim is concerned, the amount in controversy is the value to it of its intended use of the SEQUOIA during the period when the contract for her return is in

force. Since the South Carolina businessmen who owned the SEQUOIA prior to OLI and had her on public display earned well over $100,000 during the one and a half years they had her on public display, one certainly cannot say to a "legal certainty," *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938), that the amount in controversy, from OLI's point of view, fails to exceed $10,000.

24. Those statutes provide, respectively and in pertinent part:

No action shall be brought ... upon any agreement that is not to be performed within the space of one year from the making thereof ... unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by him thereunto lawfully authorized.
Fla.Stat.Annot. § 725.01.

An action may not be brought ... upon an agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action is brought, or a memorandum or note thereof, is in writing, which need not state the consideration and signed by the party to be charged therewith or a person authorized by him.

both providing that if there is any possibility that a contract can be performed within one year of its date, then it is enforceable even if it is oral. *Joe Regueria, Inc. v. American Distilling Co.*, 642 F.2d 826, 830 (5th Cir. 1981) (Florida law); *Cooper v. Saunders-Hunt*, 365 A.2d 626, 629 (D.C.App. 1976). The May 7 letter stated that the contract would be in force so long as OLI maintained its status as a nonprofit organization under § 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). That condition could have ended within one year of the date of May 7, 1981. Accordingly, the Statute of Frauds seemingly poses no problem herein. *Id.*[25]

## IV. PAROL EVIDENCE RULE

■ The parol evidence rule proscribes the admission or oral evidence "when the parties to a contract have reduced their entire agreement to writing ..." and when, *inter alia*, the parties have "*intended* that the written document cover all of their subjects of negotiation ...." *Giotis v. Lampkin*, 145 A.2d 779, 781 (D.C.Mun.App. 1958) (emphasis in original). Thus, the rule is not applicable when there is no fully integrated written document. As to Florida law, *see Schwartz v. Zaconick*, 68 So.2d 173, 175 (Fla.1954). *Accord, Restatement (2d) of Contracts* § 210, comment c. Accordingly, the May 7 letter does not run afoul of that rule because there was never,

D.C.Code § 28–3502.

**25.** Additionally, the May 7 letter may well be a sufficient "writing" to render the contract it represents enforceable despite the Statute of Frauds. *See Ammerman v. City Stores Co.*, 394 F.2d 950, 953 n.6 (D.C.Cir.1968); *Cohodas v. Russell*, 289 So.2d 55 (Fla.App.1974); *Restatement (2d) of Contracts* § 131 and comment g.

**26.** Paragraph 12(a) of the April 25 contract for the sale of the SEQUOIA, which was the only fully executed written contract between OLI and Skinner, reads as follows:

This Agreement may not be altered or modified in any way except in writing and all prior negotiations and agreements between the parties or their representatives, whether oral or written, are expressly superseded by this Agreement, and merged herein.

to and including the June 12 settlement, any fully integrated contract for sale *and* lease-back between the parties.[26] During the April 23 meeting between Gill, Skinner and Grant, Grant asked for and got a *separate* agreement for OLI's use of the SEQUOIA during the winter months. And while Skinner and Grant contemplated a final comprehensive agreement at the closing, no such agreement was entered into, ostensibly because Skinner had not had the lease-back document prepared. At settlement, Grant and Skinner agreed to keep the May 7th letter alive. Thus, the contract for sale of the SEQUOIA and the contract for her lease back to OLI were never fully integrated into one contract.

■ It may be, however, that it is possible to view the April 25th contract as a fully integrated sale agreement and the May 7th letter as a fully integrated lease-back undertaking. But, nevertheless, parol evidence is still not proscribed, under either Florida or District of Columbia law, with respect to the lease-back understanding because such parol evidence is helpful to explain (a) the meaning of the word "recommendations" as used in the May 7 letter and (b) the uses of the SEQUOIA contemplated by Grant and Skinner under the projected annual lease back provided for in that letter. Indeed, both sides did introduce at trial such evidence for such purposes without objection from the other side.[27]

The April 25 contract dealt only with sale, not with any lease back.

**27.** The District of Columbia follows the majority of jurisdictions and allows admissibility of parol in order to interpret an agreement, the language of which is ambiguous, although not allowing parol to vary the terms of an integrated agreement. *Rice v. Rice*, 415 A.2d 1378, 1380 n.1 (D.C.App.1980); *Sundown, Inc. v. Canal Square Assoc.*, 390 A.2d 421, 432 (D.C.App. 1978).

In Florida, the parol evidence rule appears to allow introduction of parol to explain ambiguities which are "latent" and not "patent." *Landis v. Mears*, 329 So.2d 323, 325–6 (Fla.App. 1976); *Ace Elec. Supply Co. v. Terra Nova Elec., Inc.*, 288 So.2d 544, 547 (Fla.App.1973).

A latent ambiguity has been defined as an ambiguity where the language employed in the ... [contract] is clear and intelligible and

## V. SUBSTANTIVE LEGAL ISSUES

█ Plaintiffs attack the binding effect upon Kawa and the Trust of the May 7 letter on, *inter alia*, essentially four grounds: [28]

A. Kawa is not bound by the May 7 letter because it was not a party thereto, and never expressly accepted, nor expressly authorized Skinner to speak or negotiate or contract for it with respect to, any of the commitments purportedly made therein.

B. The Trust is not bound by the May 7 letter because Skinner phrased it in terms of his "recommendations," which were never accepted by the Trust.

C. The May 7 letter is, in any event, too vague.

D. The lease-back to OLI is inconsistent with the purposes of the Trust.

This Court finds none of those arguments, nor any other arguments relied upon by plaintiffs, persuasive.

█ Assuming that Arendsee never expressly authorized Skinner to act for Kawa, Arendsee, by telling Grant at the June 12 closing of the sale of the SEQUOIA that Skinner and the Trust were in control of the operation of the SEQUOIA, created in the eyes of Grant, apparent authority in Skinner to act for Kawa and the Trust. Grant, in turn, acted in reliance upon Skinner's assurance that the lease-back undertaking of the May 7 letter would survive the June 12 closing. *Restatement (2d) of Agency*, § 8, provides:

Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons.

That statement reflects the law of Florida and the law of the District of Columbia. *See Insurance Mgt. of Washington, Inc. v. Eno & Howard Plumbing Corp.*, 348 A.2d 310, 312 (D.C.App.1975); *H.S.A., Inc. v. Harris-in-Hollywood, Inc.*, 285 So.2d 690, 692–94 (Fla.App.1973).

In this case, Skinner was permitted by Arendsee and Alford, who together with Skinner represented the purchasing side at the June 12 closing, to act before and during the closing as if Skinner was in charge of the deal for the purchasers. In fact, Grant relied on that apparent authority as Grant had a right to do. At the closing, all attending on the purchasing side accepted the benefits to them of the transaction with OLI which Skinner, as the spokesman for Kawa and the Trust, negotiated with Grant, *i.e.*, title to the SEQUOIA. Accordingly, those on the purchasing side must

---

suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings. A patent ambiguity is that which appears on the face of the instrument and arises from the defective, obscure or insensible language used.

*Drisdom v. Guarantee Trust Life Ins. Co.*, 371 So.2d 690, 693 n.2 (Fla.App.1979), citing *Ace Elec. Supply Co., supra*, 288 So.2d at 547. Florida courts have refused to entertain parol evidence in the presence of patent ambiguities because they do not wish to rewrite, in effect, "a contract with respect to a matter the parties obviously had in mind when they drew the agreement." *Hunt v. First Nat. Bank of Tampa*, 381 So.2d 1194, 1196 n.1 (Fla.App.1980), citing *Landis v. Mears, supra*, 329 So.2d at 326.

However, Florida courts regard an ambiguity in the language of an instrument to be *latent* when that language is capable of two (or more) constructions, both (or all) of which are compatible with the language used. *Vineberg v.*

*Brunswick Corp.*, 391 F.2d 184, 188–9 (5th Cir. 1968) (Florida law); *Ace Elec. Supply Co. v. Terra Nova Elec., Inc., supra*, 288 So.2d at 547; *Atlantic & Gulf Properties, Inc. v. Palmer*, 109 So.2d 768, 770–1 (Fla.App.1959).

**28.** Plaintiffs also have mounted an attack on the ground that Grant misrepresented the condition of the vessel and the assumability of OLI's mortgage. However, plaintiffs had ample opportunity to, and did in fact, inspect the SEQUOIA before Kawa purchased her, knew or should have known of the condition the vessel was in, knew of the non-assumability of the mortgage, and did not ask for those conditions to be remedied or adjustments to be made with regard to any of those factors. Under the circumstances, plaintiffs' problems with regard to Grant's alleged misrepresentations cannot survive the closing of the transactions involved herein. *United Pacific Ins. Co. v. County of Flathead*, 499 F.2d 1235, 1237, 1238–39 (10th Cir. 1974).

also be deemed to have accepted all of the burdens of the transaction, including the lease-back of the SEQUOIA for OLI's use, to which Skinner speaking for Kawa and the Trust agreed. *See Rustler's Steak House v. Environmental Assoc., Inc.,* 327 A.2d 536 (D.C.App.1974); *C. Q. Farms, Inc. v. Cargill, Inc.,* 363 So.2d 379, 382–83 (Fla. App.1978); *Collins v. Collins Fruit Co.,* 189 So.2d 262, 264–65 (Fla.App.1966); *Restatement (2d) of Agency,* §§ 98, 99.[29]

The Trust is in no different position than Kawa. Indeed, the Trust could only get what Kawa got since Grant for OLI sold to Kawa, not the Trust. Also at the time the May 7 letter was written, Skinner was acting as a promoter of the Trust, and spoke to Grant for the Trust and for Kawa, even during the closing.

> Persons organizing a corporation may purport to contract for it, and frequently, upon organization, the corporation assumes the obligation created in its name....

*Restatement (2d) of Agency,* § 84, comment d. In this case, those who brought into being Kawa and the Trust led, at all relevant and material times up to and including

June 12, Grant reasonably to assume that Skinner was speaking for both entities and all involved on the purchasing side.

The May 7 letter is, as plaintiffs assert, phrased in terms of Skinner's recommendations. But Skinner as well as Grant testified that that term referred to Skinner's recapitulation of a number of telephone conversations in which the two of them talked between the April 23 meeting of Gill, Skinner and Grant and the date the letter was written. The "recommendations" were not to the Trust, or to Kawa; rather they were made to Grant, and Grant accepted them on behalf of OLI on May 8, 1981.[30]

The May 7 letter is not a model of draftsmanship. Yet it sufficiently states the essential elements of a contract—the contract which was entered into by OLI and the Trust. The letter sets forth (in ¶¶ 1 and 2) the Trust's responsibility to provide a crew for the SEQUOIA, maintenance and insurance coverage, with OLI to bear those costs directly relating to its use of the SEQUOIA (¶ 5). The terms under which OLI's use was to be exercised are also set out (¶¶ 3–4 and 6–7).[31] The compensation to be provided to the Trust for such use is stated (¶ 8).

---

**29.** Plaintiffs also argue that the May 7 letter, if it created any duties at all, created only nonassignable duties on the part of Skinner and/or the Trust, and that such duties should not affect Kawa's title to and control of the use of the SEQUOIA. However, since Skinner had apparent authority, in the eyes of Grant, to bind not only the Trust but Kawa as well, Kawa, by Skinner's actions, itself accepted, during the June 12th closing and perhaps also before, the duties set forth in the May 7 letter, whether or not those duties are assignable as they would appear, in any event, despite plaintiffs' contentions to the contrary, to be.

**30.** Plaintiffs argue that the last paragraph of the May 7 letter sets forth a clear intent on the part of Skinner and Grant to be bound by a future written agreement, and not by the May 7 letter. Whether or not that intention existed at the time Skinner wrote the letter, Skinner's actions at the June 12 closing evidence an intention on his part, and on the part of both Kawa and the Trust, to be bound by the terms of the letter.

**31.** The fact that ¶ 3 of the May 7 letter states that "[Skinner] ... or the Trust will make *every effort* to see" that the SEQUOIA is taken to Florida every year does not render the letter

too vague to enforce. *Cf. Western Geophysical Co. v. Bolt Assoc., Inc.,* 584 F.2d 1164, 1169–72 (2d Cir. 1978); *Bloor v. Falstaff Brewing Corp.,* 454 F.Supp. 258, 266–67 (S.D.N.Y.).

In addition, the contract between OLI and the Trust is not too uncertain or indefinite simply because the contract does not include a definite time for its termination. Paragraph 4 of the May 7 letter states that OLI will have access to the SEQUOIA "so long as ... [OLI] is recognized as a non-profit public charity under Section 501(1)(3) of the Internal Revenue Code ...." While seemingly no District of Columbia or Florida cases speak to the question, it appears that under the general law of contracts such words do not render a contract unenforceable as too indefinite. *Restatement (2d) of Contracts* § 33(2) states:

> The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

Illustration 5 to Section 33 is as follows:

> A offers to employ B for a stated compensation as long as B is able to do specified work, or as long as a specified business is carried on, and B accepts the terms offered. The length of the engagement is sufficiently definite for the formation of a contract.

Plaintiffs also contend that the uses of the SEQUOIA contemplated by the May 7 letter are inconsistent with what plaintiffs conceive to be the Trust's purposes. That may or may not be. But Skinner, Gill and Arendsee were at all times during the pre-closing period informed of OLI's proposed uses of the SEQUOIA and never stated, directly or indirectly to Grant, that they would not close the deal until the lease back to OLI for those purposes was discarded or altered. Indeed, Skinner, Gill and Arendsee permitted Grant to believe up to and including the time of closing that the lease back set forth in the May 7 letter was agreed to. Further, while Arendsee and others on the purchasing side may not like certain of the contemplated promotions and other activities of Grant and OLI with regard to the SEQUOIA, OLI's proposed uses of the vessel do not appear to be in conflict in any way with OLI's "charter, articles of incorporation and by-laws."[32] The Trust and OLI, each a tax exempt nonprofit corporation, seemingly desire to promote the preservation of the SEQUOIA and her utilization for fund raising purposes.

## VI. CONCLUSION

This Court concludes that a commitment was made to Grant by Skinner before and during the June 12 closing to return the SEQUOIA to Florida for OLI's use during the December 1 to Easter period each year, that the commitment was relied upon by OLI and Grant when the closing took place and the vessel was sold, and that the commitment is binding upon Kawa and the Trust.

Thus, OLI is entitled to judgment as defendant in connection with plaintiffs' complaint and to relief herein pursuant to OLI's counterclaim. While the liability and relief issues have been bifurcated, it would tentatively appear that OLI is entitled to specific performance of its contract for the return each year of the SEQUOIA, because of her

uniqueness (she is, after all, the only Presidential yacht this nation has ever had), and because of the fact that it is this very uniqueness which makes her an essential part of OLI's fund raising program. It is not just any yacht which OLI wished and continues to wish to use as a part of its fund raising activities; it is the SEQUOIA. *See Mangus v. Porter*, 276 So.2d 250, 251 n.1 (Fla.App.1973); *Equitable Gas Light Co. v. Baltimore Coal Tar & Mfg. Co.*, 63 Md. 285, 299–300 (1885). In addition, since the time for specific performance of the contract during the winter of 1981–82 has passed, it would tentatively seem that damages, at best as they can be measured, for that period should be awarded to OLI in order to make OLI whole. *See Reis v. Sparks*, 547 F.2d 236, 239–40 (4th Cir. 1976) (Maryland law); *Weber v. White*, 102 So.2d 736, 737 (Fla.App.1958). Counsel for both sides are asked to confer and jointly to submit, in writing, on or before July 23, 1982, (a) factual stipulations as to all relief issues to the fullest extent possible and (b) a briefing schedule as to the law in connection with those issues.

---

17 Am.Jur.2d, *Contracts* § 80, at 420 states: "Words which fix an ascertainable fact or event, by which the term of a contract's duration can be determined, make the contract definite and certain in that particular."

**32.** See ¶ 4 of the May 7 letter quoted at p. 1057 *supra*.