363 So.2d 379 (1978)
C.Q. FARMS, INC., a Florida Corporation, Appellant,
v.
CARGILL INCORPORATED, a Delaware Corporation, Appellee.
No. FF-370.
District Court of Appeal of Florida, First District.
October 3, 1978.
Rehearing Denied November 8, 1978.
*380 George L. Hudspeth and Dana G. Bradford, II of Mahoney, Hadlow & Adams, Jacksonville, for appellant.
James E. Cobb and Raymond Ehrlich of Mathews, Osborne, Ehrlich, McNatt, Gobelman & Cobb, Jacksonville, for appellee.
BOOTH, Judge.
This cause is before us on appeal from the final judgment of the Circuit Court, Nassau County, entered on directed verdicts in favor of appellee Cargill on all claims and counterclaims.
Cargill, Inc., brought suit against C.Q. Farms for an account due and owing for goods sold and delivered and balance due in poultry financing transactions. Cargill's complaint also sought foreclosure of a security agreement in the nature of a lien on C.Q.'s accounts receivable.
C.Q. Farms answered, asserting by way of affirmative defenses that Cargill had breached the agreement between the parties concerning a line of credit of $250,000 to be extended by Cargill in consideration for the lien on C.Q.'s accounts receivables, which breach resulted in damages to C.Q.'s business. C.Q. also counterclaimed (1) for rescission and cancellation of the recorded security agreement and (2) for business damages resulting from failure of Cargill to extend the promised line of credit. C.Q. Farms alleged that it "was induced to execute the aforesaid agreement (lien on accounts receivable) based on the promise of plaintiff to furnish a line of credit of $250,000 for the purchase of feed and stock (fowl) for use in defendant's farming (chicken) business, without which representation the agreement would not have been considered by defendant."
At some point during the trial the claim of Cargill for enforcement of lien, and C.Q.'s defense and counterclaim for cancellation of the lien, were removed from consideration by the jury and reserved for determination at a future time by the court. The enforcement and validity of the lien is thus not at issue on this appeal. However, the circumstances surrounding the execution of the lien on accounts receivable, and the fact of Cargill's acceptance, and suit for enforcement, of the lien, bear on the contractual relationship between the parties, as well as the damages claimed by C.Q. Farms. This was an issue below and is an issue on appeal.
At trial both sides presented evidence as to the past transactions between the parties, the custom and practice within the egg and poultry business and the feed business, as well as the internal operating procedures of both companies. The evidence adduced, and permissible inferences therefrom, created conflicts on questions material to liability as well as to damages. These matters were appropriately for the jury. From the record here we can only conclude that the trial court in directing the verdict and withdrawing the case from consideration by the jury at the conclusion of all the evidence, was of the view that no applicable principle of law would support a verdict favoring C.Q. Farms, either wholly or partially, on its affirmative defenses or its counterclaim for breach of contract.[1] We disagree.
The jury was entitled to accept the testimony of Paul Dilgard and other witnesses for C.Q. Farms and find that the terms of the contract between the parties were as testified to by those witnesses rather than as testified to by Cargill's witnesses. The existence of a contract between the parties is evidenced by written commitments of C.Q. Farms of record, and by the evidence of past performance on both sides under the *381 agreement.[2] The question is what commitment was made by Cargill as consideration for the contract.
Cargill's evidence was that extension of a $150,000 line of credit was the extent of its contractual obligation, and that its District Manager, Hugh Felder, told Paul Dilgard, C.Q.'s president, in a phone conversation prior to the execution by C.Q. of the finance agreement, that a $150,000 line of credit had been approved. That evidence is directly contradicted by Dilgard, who denied the Felder communication and testified as follows:
"Q And did you ever settle with Mr. Meehan [Regional Manager for Cargill] upon what additional security would be required for this line of credit?
A [Dilgard] After a lot of discussion and all, we did reluctantly; yes, sir.
Q And what security package was contemplated in this respect?
A We pledged to them our accounts receivable.
Q Did you maintain in existence a personal guarantee?  Was that a part of it?
A Yes, sir. They asked that it remain.
Q Were the pullet financing arrangements to continue to be on a secured basis with respect to the birds?
A Yes, sir; they had title to the birds.
Q And that was a security package?

A Yes, sir. To my knowledge. Yes, sir.
Q During your discussions with Mr. Meehan, Mr. Dilgard, did you ever speak with him or mention to him any other figure than $250,000 for the total line of credit?
A Never; at no time.
Q Did he ever mention any other figure to you?
A I don't recall any other figure ever being mentioned but that. That was the figure we needed to continue our business, to conduct our business and operate efficiently. That was the reason for our purchase of the egg machine.
* * * * * *
Q Mr. Dilgard, who brought that document [assignment of C.Q.'s accounts receivable] to you?
A Don Meehan.
Q And where did you sign it?
A It was signed in my office.
Q What did you state to Mr. Meehan upon presentation of that document?

A I stated to him that I  or he stated to me that our line of credit had been approved for the $250,000 and this was the reason for the document and my signature." (e.s.)
William Smith, witness for C.Q., was present at the time and heard Meehan's statement.
In evaluating the foregoing testimony, C.Q. Farms was entitled to have the jury consider the past transactions between the parties and Cargill's practice of making its own financial commitments verbally through either Felder or Meehan, while obtaining written financial commitments from C.Q. Farms. The evidence establishes that Meehan had authority to act on Cargill's behalf in obtaining the execution by C.Q. Farms of liens, finance arrangements and feed purchase commitments and, as an essential part of that function, had authority to state the amount of the line of credit approved, in obtaining execution of the documents. The jury was entitled to find on the record here that the total amount pledged by C.Q., including the flocks, accounts receivable of more than $247,000, as well as personal guarantees by C.Q. owners, was more than adequate to support the $250,000 line of credit. The security was in addition to the anticipated profit to Cargill from sales of feed for the flocks to be financed[3] and interest charges on poultry finance agreements.
*382 There was evidence that Cargill's practice of keeping its obligations on credit arrangements with customers verbal gave flexibility from Cargill's point of view. There was evidence that Cargill felt free to "call our money and discontinue business with the account" if sales of feed to C.Q. dropped below a certain percentage point of return to Cargill.
C.Q. was also entitled to have the jury consider the evidence that the negotiations between Meehan and Dilgard were for the extension by Cargill of a specific amount of credit in return for a specific package of financing agreements in addition to the anticipated feed purchases by C.Q. Farms. The evidence was that the specific amount of credit sought was $250,000 and that amount, and no less, would enable C.Q. to purchase both flocks and feed sufficient to maintain economic utilization of C.Q.'s egg processing machine that could process 1,200 dozen eggs per hour. Testimony was that C.Q. was unwilling to place a lien on its accounts receivable for any amount less than that specifically requested.
This evidence supports C.Q.'s contention that the request for the line of credit was an offer to enter into a specific financial agreement, a key provision of which was the $250,000 line of credit. Cargill admittedly knew the terms of C.Q.'s offer but made no counter-offer of $150,000. Some months after execution of the security agreement by C.Q. (at a time when C.Q. was feeding more than 200 thousand chickens), Cargill served notice that the line of credit was $150,000 and no further credit would be extended. There is conflict as to whether C.Q. was in arrears on any of its obligations to Cargill at that time.
Much evidence below, and argument here, has been directed to the question of whether Cargill's Regional Manager, Meehan, had real or apparent authority to bind Cargill in financial matters. That question was clearly for the jury in view of the particular facts of record. There is, however, another basic concept of agency law which does not depend on the agent's authority, and is applicable here, to wit: The principal may not accept the benefits of a transaction negotiated by the agent and disavow the obligations of that same transaction. The rule is stated in the Restatement of Agency,[4] in part as follows:
"The purported principal must take the transaction in its entirety, with the burdens as well as the benefits... . He cannot affirm a contract and disavow unauthorized terms which the purported agent included ...
* * * * * *
There is affirmance if the purported principal, with knowledge of the facts in an action in which the third person ... is an adverse party: (a) bring suit to enforce promises which are part of the unauthorized transaction or to secure interests which were the fruit of such transaction and to which he would be entitled only if the act had been authorized..."
The foregoing rule applies in Florida. Proodian v. Plymouth Citrus Growers Association, 152 Fla. 684, 13 So.2d 15 (1943); Standard Oil v. Nickerson, 103 Fla. 701, 138 So. 55 (1931); Meyer v. Nator Holding Company, 102 Fla. 915, 136 So. 636 (1931); Love v. Brown Development Co. of Michigan, 100 Fla. 1373, 131 So. 144 (1930); Massachusetts Bonding and Ins. v. Hoxie, 129 Fla. 332, 176 So. 480 (1937) and Peace River Phosphate Mining Company v. Thomas A. Green, Inc., 102 Fla. 370, 135 So. 828 (1931). *383 In the Meyer case, supra, the Supreme Court held (136 So. at 638):
"The law is settled in this jurisdiction that when one person acts for another who accepts the fruits of his efforts, the latter is deemed to have accepted the methods employed, and he may not, even though innocent, receive such benefits and at the same time disclaim responsibility for the means by which they were acquired ..."
In Standard Oil v. Nickerson, supra, the agent of Standard Oil secured a release from an employee of Standard Oil who had suffered personal injuries on the job, and in consideration promised the injured employee that Standard Oil would agree to continue him in its employ for his lifetime at a salary equal to the amount he was earning at the time he received injuries. The evidence was that the agent of Standard Oil, who had authority to obtain releases from injured workmen, was without authority to make such an agreement. The Supreme Court affirmed a jury verdict for the employee quoting the Meyer decision, supra, and stating:
"In this case, it appears that the Standard Oil Company has accepted the releases which were secured by its agent Rogers. And, by accepting them, it has obtained the fruits of the exercise of Rogers' agency in procuring such releases, and it cannot be heard to complain in this case ..."
In the instant case Cargill accepted the lien on accounts receivable obtained by its agent on the representation that a $250,000 line of credit was approved, that lien was recorded and Cargill subsequently filed suit for enforcement of the lien. Those facts plus the testimony of Paul Dilgard, quoted above, are sufficient to take this case to the jury to determine whether Cargill's obligation under the contract, actual, implied or as ratified on acceptance of the benefits of the transaction, was for a $250,000 line of credit.
The other points on appeal are the alleged error of the trial court in striking C.Q.'s damage schedule, Exhibit 43, prepared by Mr. Smith, from evidence, and in refusing to permit C.Q. to read the deposition of Don Meehan into evidence. The testimony of Smith was based on calculations of a wide number of factors using industry standards and past business experience as a measure of business damage and was properly admissible. However, the admissibility of the damage schedule itself was within the trial court's discretion and no error has been demonstrated in the exercise of that discretion. As to the deposition of Don Meehan, a witness who was available to testify, but not called by either side, no error was shown in the trial court's refusal to allow use of the deposition by C.Q. Farms as part of its case.
Accordingly, the judgment below is REVERSED and the cause is REMANDED for further proceedings consistent herewith.
SMITH, Acting C.J., and ERVIN, J., concur.
NOTES
[1] Verdict for Cargill was entered by the court in the amount of $179,067.60, undiminished by any set-off or counterclaim.
[2] No question of Statute of Frauds was presented.
[3] Anticipated feed sales by Cargill to C.Q. Farms as a result of Cargill's extension of line of credit was 9,000 tons per year. Overall, the projected ROI (return on investment) to Cargill was 26% to 38%. It appears that C.Q. was required to feed the flocks subject to lien with Nutrena feed purchased from Cargill. At least two of the security agreements provided:

"The financing assistance made available hereunder will be extended for the purchase of Nutrena Feeds .. . Should producer [C.Q. Farms] cease using such assistance while the same is available under the provisions hereof by entering upon a feeding program for said pullets involving other than Nutrena Feeds, then Cargill, at its option, may declare the entire amount owing hereunder immediately due and payable and be free of all further obligations under this agreement."
A Cargill memo also shows that the line of credit arrangement was to "eliminate Allied," a competing feed supplier from selling to C.Q., and by August, 1974, 100% of C.Q.'s feed was purchased from Cargill.
[4] Restatement, Law of Agency, 2d, §§ 96, 97.