NIMMONS, Judge.
Hobbs Construction and Development, Inc. (Hobbs) and its surety, Insurance Company of North America (INA), defendants in the court below, appeal from an award by the trial court, sitting non-jury, in favor of Colonial Concrete Company, d/b/a Southern Concrete (Southern), in an action brought by Southern for sums allegedly owed for concrete which Southern supplied in connection with the 1982 renovation and expansion of the Gator Bowl in Jacksonville. Hobbs was the general contractor. We affirm the final judgment.
The facts summarized in our opinion are either those recited in the trial court’s final judgment or, where not so recited, based upon evidence which supports the trial court’s award.
On December 17, 1981, Hobbs entered into a contract with the City of Jacksonville whereby Hobbs agreed to do expansion and renovation work on the Gator Bowl for a total contract price of $12,801,400. The work was to be substantially completed by the next Florida-Georgia football game which was scheduled for November 6,1982.
Prior to signing the purchase order for the concrete, Southern’s vice president and general manager met with Hobbs’ project superintendent at the construction site and discussed certain terms, including, but not limited to, prices for certain concrete materials. Overtime was discussed and it was agreed that the delivery schedule for concrete materials would be between 7:00 a.m. and 7:00 p.m., Monday through Friday, and 7:00 a.m. to 5:00 p.m. on Saturdays. A *257 purchase order was prepared at Hobbs’ office in Panama City where it was signed by Hobbs’ president and forwarded to Jacksonville where it was signed by Southern’s sales manager.
The purchase order, which covered some but not all of the materials purchased by Hobbs from Southern, contained the following:
Above prices are to remain in effect for duration of the job. There will be no additional charges for concrete on Saturdays or for overtime. There is no minimum on concrete to be shipped per order.
At the outset of the job, Hobbs, viewing the project as a so-called “6-10 job,” commenced work on a 6-10 basis, i.e., six days per week and ten hours per day.
By early summer, the concrete pouring schedule established by Hobbs increasingly involved deliveries into the night. Initially, Southern complied with Hobbs’ extended scheduling. However, Southern eventually began to refuse to deliver concrete if the pouring was going to take until 9:00 or 10:00 p.m.
In mid-July, 1982, Hobbs’ project manager initiated discussions with Southern’s general manager in order to reach agreement on a night schedule for the delivery and pouring of concrete. By this time, Hobbs had determined that it needed the cranes, which were used for hauling the concrete buckets, to do other things during &e day. In response to Hobbs’ project manager’s request, Southern’s general manager quoted the price of $140.00 per hour as the service charge for deliveries from 7:00 p.m. to 7:00 a.m., Monday through Saturday, and from 5:00 p.m. Saturday to 7:00 a.m. Monday, with a four-hour minimum. A day or so later, Hobbs’ project superintendent went to Southern’s office, and the parties agreed upon the above extended schedule terms except that the service charge would be $120 instead of $140. Hobbs’ project superintendent mentioned to Southern’s general manager that he would get him a purchase order. Hobbs’ orders for nighttime pourings under the new arrangement commenced that night and continued until the latter part of October 1982.
For each of the many pourings which were ordered by Hobbs for nighttime and Sundays, Southern prepared a special delivery ticket designating the date, time period and an amount of time designated as “overtime.” The deliveries were accepted by Hobbs’ agent who signed the tickets when the concrete was delivered to the site.
Southern forwarded to Hobbs’ home office periodic billings for overtime under the July extended schedule agreement. Hobbs paid the first such bill on or about August 15, 1982, in the amount of approximately $15,000.00.[1] As Hobbs continued to utilize nighttime and Sunday pourings by Southern, Southern forwarded similar billings for overtime to Hobbs. Although Hobbs’ home office personnel advised Southern on more than one occasion that payment for these billings would be forthcoming, no further payment for the overtime was ever received by Southern. Finally, as the project neared completion nine days before the Florida/Georgia football game, Hobbs notified Southern that Hobbs would not pay the overtime billings, citing as the basis for refusal the language of the original purchase order. Accordingly, Southern stopped further deliveries of concrete. Thereupon, Hobbs stopped payment on its October 22 check for $42,099.96 which had been sent to Southern in payment of materials less a deduction for the sum previously paid by Hobbs on August 15 for overtime.
Hobbs contends that: (1) assuming ar-guendo that Hobbs’ agents had authority to contract for their principal, the July *258 agreement was void because of lack of consideration; (2) its agents lacked authority to bind Hobbs to the July overtime agreement; and (3) the evidence established Hobbs’ affirmative defense that Southern charged Hobbs for materials which Southern never delivered to the job site. We will discuss such contentions in the above order.
Hobbs’ first point depends upon the conclusion that the evidence presented required a finding by the judge, sitting as trier of the fact, that around-the-clock pourings, including Sundays, were contemplated by the parties in the January purchase order. We have no difficulty in rejecting that position. The record includes competent testimony that a normal or standard work week for a concrete supplier is eight hours per day, five days per week. As we earlier noted, the trial court found, based upon the evidence, that the parties originally contemplated a delivery schedule of between 7:00 a.m. and 7:00 p.m., Monday through Friday, and 7:00 a.m. to 5:00 p.m. on Saturdays, a schedule which was in excess of the above norm. We cannot say that the brief provision in the January purchase order that “[tjhere will be no additional charges for concrete on Saturdays or for overtime” necessarily meant that Southern was obligated to deliver and pour at the purchase order price at any time of the day or night including Sundays. If that is, indeed, what Hobbs intended, it should have spelled out such intent in more explicit terms.
We conclude that Southern’s agreement in July to deliver and pour at any time, day or night, including Sundays, certainly constituted consideration over and above that which was given for the January agreement and, therefore, rendered the July agreement enforceable.
We turn now to Hobbs’ next contention that its agents lacked authority to bind Hobbs to the July agreement for overtime. Hobbs asserts that the trial court erred in finding that Hobbs’ agents had apparent authority to agree to the overtime arrangement. Significant to this issue is the fact that, as work on the project progressed, it became apparent to Hobbs that it would be necessary to materially alter its performance, in order to complete the project on time, by resorting to an around-the-clock pouring schedule with its concrete supplier. Having affirmed, as discussed above, the trial court’s finding that such á schedule was not provided for in the original agreement, we are entitled to assume that Hobbs knew that its agreement with Southern did not provide for such schedule. Knowing that its concrete supplier was refusing to deliver on an around-the-clock schedule without a satisfactory agreement therefor and that, in order to have a reasonable chance of completing the project timely and avoiding a material breach of the contract with attendant substantial penalties, Hobbs knew that it must revise its agreement with its concrete supplier, and do so quickly. Hobbs was apparently content to leave it up to its project manager and project superintendent to make arrangements with the concrete supplier for such around-the-clock deliveries. When Hobbs’ agents and Southern’s general manager reached agreement on the new schedule, Hobbs’ orders for night deliveries commenced immediately. And so the evidence justifies the conclusion that Hobbs knew or should have known that its agents, in fact, reached agreement for the extended pouring schedule because it knew that its agents were negotiating for such with Southern and that night deliveries commenced immediately thereafter.[2]
*259 Under the circumstances, it was reasonable for Southern to assume that Hobbs’ agents had authority to speak for the company in contracting for the around-the-clock pouring schedule. At least such an inference is permissible from the evidence. And that inference is not necessarily precluded by the fact that Hobbs’ agent told Southern’s general manager that he (Hobbs’ agent) “would get him a purchase order.” The trier of fact was not required to find that Southern should have interpreted this to mean that issuance of a purchase order from the home office was a prerequisite to the existence of an agreement for nighttime deliveries. This is especially true where Hobbs immediately thereafter, without issuance of a purchase order, commenced ordering nighttime deliveries. Moreover, from the project’s inception, numerous concrete products were ordered from Southern by Hobbs’ on-site personnel without a purchase order. Further, Hobbs’ president testified that its project manager and project superintendent had actual authority to enter into “minor” agreements and that there was no set rule on the distinction between major and minor agreements.
Even if the Hobbs infrastructure was such that Hobbs’ project manager and project superintendent did not have actual authority to enter into the subject agreement for overtime deliveries, the circumstances in this ease were such that the trier of fact could properly find that such agents had the apparent authority to order on Hobbs’ behalf concrete based upon the new agreement. As was stated in Tampa Sand & Material Company v. Davis, 125 So.2d 126, 127 (Fla. 2nd DCA 1960):
The power of an agent to bind his principal may rest on real or actual authority conferred in fact by the principal or may be founded on apparent or ostensible authority arising when the principal allows or causes others to believe the agent possesses such authority, as where the principal knowingly permits the agent to assume such authority to where the principal by his actions or words holds the agent out as possessing it.
See also O’Neal v. Crumpton Builders, Inc., 143 So.2d 844 (Fla. 1st DCA 1962); Taco Bell of California v. Zappone, 324 So.2d 121 (Fla. 2nd DCA 1975); 2 Fla.Jur. 2nd, Agency and Employment § 35. The question of whether acts are within the scope of an agent’s apparent authority is a question of fact, the resolution of which will not be set aside unless clearly erroneous. One Hour Valet of America, Inc. v. Keck, 157 So.2d 83 (Fla. 2nd DCA 1963).
It is apparent from the evidence that, by early summer, Hobbs found itself in a tight situation insofar as completing the project timely and that it relied heavily upon its project manager and superintendent to get the project on track by making the necessary arrangements with its concrete supplier. Hobbs’ project manager described the project as unique and found themselves with a “tiger by the tail.” He graphically described his efforts at obtaining a new concrete pouring schedule thusly: “I tried to play like a duck, stay calm on the surface and I was paddling like mad underneath.”
In short, the evidence in this case is susceptible of the view that Hobbs’ on-site people had apparent authority to contract for the critically-needed around-the-clock pouring schedule in that Hobbs’, by its actions during an apparent near-crisis situation, held out its agents as having authority to speak for Hobbs in agreeing to the new schedule.
Inasmuch as the trial court’s judgment was predicated upon and sustainable under the principle of apparent authority, we do not choose to address other related principles which may have application to the circumstances of this case, such as- estoppel or ratification of an agent’s unauthorized acts. See 2 Fla.Jur.2nd Agency and Employment §§ 56, 58; Spurrier v. United Bank, 359 So.2d 908 (Fla. 1st DCA 1978); C.Q. Farms, Inc. v. Cargill, Inc., 363 So.2d 379 (Fla. 1st DCA 1978); United Chemicals, Inc. v. Welch, 460 So.2d 540 (Fla. 1st DCA 1984).
*260 In their third point, appellants challenge the trial court’s adverse ruling on appellants’ claim that Southern was not entitled to the full amount awarded because Hobbs, so it says, did not actually receive the 11,695 cubic yards of concrete for which it was billed. Hobbs sought to impeach the credibility of Southern’s delivery tickets (which showed the quantity delivered as well as the date and time of delivery) by presenting expert testimony based, in part, upon estimates as to what the project called for. On the other hand, evidence relied upon by Southern included the delivery tickets which were signed by Hobbs’ people when each delivery was made, and the testimony of Southern’s drivers whose testimony included descriptions of the substantial quantities of concrete wasted by Hobbs. And, of course, Hobbs was responsible for the concrete it ordered even if, upon the truck’s arrival at the project site, Hobbs was, for some reason, unable to accept all of the truck’s contents. The issue of the quantity of concrete delivered was a question of fact for the trial court, and the court’s resolution of the issue in favor of Southern is clearly sustainable under the evidence.
AFFIRMED.
JOANOS and WIGGINTON, JJ., concur.

. Prior to the August 15, 1982, payment, Southern’s general manager, not having received the purchase order which Hobbs’ project superintendent had mentioned in July when the parties reached the agreement on the overtime arrangement, called Hobbs’ project manager who advised that he thought that a purchase order had been issued and said he would look into it. That telephone conversation and the subsequent August 15 payment for overtime apparently allayed any concern on the part of Southern regarding the lack of a purchase order.

. Hobbs’ vice-president and general manager, Mr. Wenick, who was among the company’s personnel with actual authority to enter into major agreements on behalf of Hobbs, was fully aware of the negotiations going on between Hobbs’ agents and Southern's general manager for around-the-clock pourings. Wenick was also aware of the rate which had been agreed upon in the negotiations for around-the-clock pourings and that such pourings commenced shortly thereafter. Wenick knew that it would be necessary to reach agreement on the new pouring schedule in order to meet the completion deadline and avoid liability for breaching its contract with the City including substantial penalties in the range of $13,000 per day.